UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARCELLUS BALL,

                     Plaintiff,                         Case Number 21-11653

v.                                              Honorable David M. Lawson

CITY OF DETROIT, IAN SEVERY,
DONNA MCCORD, and JASON ADAMS,

                     Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DISMISSING COMPLAINT

Plaintiff Marcellus Ball, a 35-year veteran of the Detroit Police Department, brought this action against the City of Detroit and command officers in the City's 10th Precinct alleging that the defendants retaliated against him for criticizing certain police practices that Ball believed were unconstitutional and therefore unlawful. After discovery closed, the defendants moved for summary judgment. Fact questions abound about the defendants' conduct implementing and sanctioning illegal arrest practices, and the extent of the plaintiff's complaints about them. But the plaintiff has not offered sufficient evidence that connects his complaints to the adverse action he describes. The motion, therefore, will be granted and the case dismissed.

### I. Facts and Proceedings

#### A. The 10th Precinct's Organizational Structure

Plaintiff Marcellus Ball believed that the defendants had authorized a policy that directed officers in the precinct to make unconstitutional motor vehicle stops and arrests for concealed weapons crimes. In 2021, Ball was a senior sergeant in the 10th Precinct Detective Unit (PDU), where he supervised around 10 officers and detectives who primarily investigated non-fatal shootings.

Each precinct has its own PDU, which in turn has its own command structure.  Within this structure in the 10th Precinct, Ball reported directly to defendant Lieutenant Donna McCord, who in turn reported to defendant Captain Ian Severy.  The commanding officer for the 10th Precinct PDU was Commander Tiffany Stewart and the deputy chief for the Detective Bureau who oversaw all PDUs was Deputy Chief Marlon Wilson.  Other units within the 10th Precinct operated under a different command structure, including the Special Operations Unit (SOU), which is charged with investigating serious crimes to disrupt gang activities and prevent future violence.  Although Ball's supervisors and commanding officers did not have administrative or operational authority over the 10th Precinct SOU, members of each team were in "constant communication" with each other, Adams dep., ECF No. 32-7, PageID.1440.  As a result, Ball often was in direct contact with the 10th Precinct SOU lieutenant, defendant Jason Adams.  Although Adams was outside Ball's direct chain of command, Ball nevertheless saw Adams as "the boss . . . my boss, so-to-speak." Ball dep., ECF No. 32-2, PageID.1324.  Ball explained that he "worked together" with Adams because Adams was "my ranking supervisor" and Ball "had to listen to" Adams as his "subordinate." *Ibid.*

As a supervisor himself, Ball was responsible for, among other things, for verifying arrest reports, ensuring that probable cause existed for arrests, and releasing individuals arrested without probable cause.  These responsibilities are detailed in the Detroit Police Department's manual, which also mandates that supervisors "[p]romptly obey orders of higher-ranking members" and "closely observe the work of their immediate subordinates . . . for any misconduct."  DPD Manual, Supervision, § 101.10-4, ECF No. 30-16, PageID.981.  When reviewing probable cause and determining whether to apply for warrants, Ball routinely called the Wayne County prosecutor's office for assistance, reaching out most often to assistant prosecutors Lori Mireless and Kim Miles.

Ball testified that reaching out to prosecutors was not against protocol and that, for 25 years, he has "always" presented his cases to the prosecutor "to avoid having people arrested and going to jail who haven't done anything wrong."  However, he also acknowledged that he was never directed to reach out to prosecutors and never discussed doing so with his direct supervisor, Lieutenant McCord.  McCord, on the other hand, testified that it would be improper for any member to seek the prosecutor's input on developing probable cause and that she "absolutely" would "never" instruct Ball to do so.

The department's manual also establishes a code of conduct appliable to all members.  The code of conduct requires members to "observe all laws, regulations, procedures, and lawful commands of all ranking members of this department."  DPD Manual, Code of Conduct, § 102.3-5.1(1), ECF No. 30-14, PageID.952.  Under this policy, "[m]embers who withhold information, fail to cooperate with departmental investigations, or who fail to report the misconduct of members to a supervisor, whether on or off duty, shall be subject to disciplinary action."  *Id.* at § 102.3-5.1(2), PageID.953.  The "[f]ailure to report the misconduct of any member and/or to take appropriate action" is a "prohibited act."  *Id.* at § 102.3-6.2(2), PageID.955.  "Gossiping about a member of the DPD concerning personal character or conduct" also is prohibited, *id.* at § 102.3-6.15(2), PageID.986, because of gossiping's potential to create conflict within a command structure.

### B.  The Questionable Police Practices

On February 13, 2019, the lieutenant then in charge of the 10th Precinct PDU, Michael DiCicco, sent an email to supervisors directing them to tell their "troops and fellow supervisors" to arrest "all occupants" of a stolen vehicle, despite the "long standing belief that the Wayne County Prosecutors will not sign a warrant for the passengers."  DiCiccio Email, ECF No. 33-2,

PageID.1560. The email specified that "[t]he same applies in the case of a CCW [carrying a concealed weapon] motor vehicle," because "[i]nvestigators may uncover details of other crimes during interrogation of any and all arrested persons" and "[a]ny information or persons identified and entered into our database could be a valuable resource in the future. . . even if the detective discharges the arrestee or the prosecutor refuses to sign a warrant." *Ibid.* DiCicco sent the email directly to Ball and other supervisors. Although Ball insists that he was not a recipient of this email, the defendants recently discovered a copy addressed directly to Ball. Neither Lieutenant McCord nor Lieutenant Adams was assigned to the 10th Precinct at the time Lieutenant DiCicco sent out this directive. McCord's assignment began on December 21, 2020, and Adams's assignment began on June 29, 2020.

Ball says that he began to notice a significant increase in CCW motor vehicle arrests in early 2021, as well as an increase in the number of CCW motor vehicle warrants being denied by the Wayne County Prosecutor's Office. Ball grew concerned that officers were stopping motorists for minor traffic violations as a pretext for conducting searches and making CCW arrests of multiple passengers without reason to believe they each had constructive possession of a firearm. He said that several PDU officers brought such cases to him because they were "not comfortable trying them."

Ball testified that around May 20 and 24, 2021, he took his concerns to "the sergeants and officers" of the Special Operations Unit — including Lieutenant Adams — as well as to PDU Captain Severy. He also called Wayne County assistant prosecuting attorneys Lori Mireless and Kim Miles to inform them that arrests were being made without probable cause. However, Ball said that no one would listen to him, and that Adams instead argued with him. Ball then discovered that Lieutenant Adams was behind the increase in CCW motor vehicle arrests: Special Operations

- 4 -

officers allegedly told Ball that Adams ordered them to arrest everyone in the vehicle if a firearm was found, instructing them that, "Everybody in the car goes with a gun no matter what. Everybody goes." Ball dep., ECF No. 32-2, PageID.1327. Detective Mia Nikolich told the Internal Affairs Division that she overheard Adams issue this "blanket" order.

Adams denies ever giving such an order. He testified that his officers "do not arrest every occupant [of a motor vehicle] regardless of the circumstances" and only arrest multiple individuals where "individualized probable cause exist[s]." Adams dep., ECF No 3207, PageID.1444. He also denied that Ball ever expressed his concerns that officers purposefully were making unconstitutional stops and CCW arrests. To the contrary, Adams testified that Ball "never confronted or engaged in that conversation," *id.* at PageID.1437, or came to Adams regarding any arrests Ball believed were made without probable cause.

Severy similarly denies that Ball ever came to him with concerns about systematic, unlawful CCW motor vehicle arrests. He testified that he was disappointed that Ball never came to him directly because then he could have intervened immediately to stop any problematic policing practices. Although Ball sometimes discussed individual cases with Severy, he never suggested that there was an unconstitutional "blanket" policy driving officers to make arrests without probable cause.

Lieutenant McCord and Ball agree that Ball never brought his concerns regarding pretextual stops to McCord or to Commander Stewart. Ball explained that he did not trust Stewart and there was no need for him to make a report to McCord because she was aware of the increase in improper CCW motor vehicle arrests due to Ball "discharging all these prisoners and not doing in custodies." Ball dep., ECF No. 32-2, PageID.1329, 1323.

The parties dispute whether there actually was a spike in warrant denials for CCW motor vehicle arrests in early 2021.  Ball testified that he could not provide a number of how many unlawful arrests were made.  However, he identified for the department's Internal Affairs Division six cases where he believed officers were not justified in making stops, conducting searches, or making arrests.  Internal Affairs reviewed all six cases and found that probable cause existed for every arrest.  The department's Civil Rights Division also later conducted an audit that details the number of CCW motor vehicle arrest warrants prosecutors declined to issue.  The audit report indicates that prosecutors denied 62 CCW motor vehicle warrants in 2021, including in 19 cases where officers arrested multiple occupants despite recovering a single firearm.  The report does not include prior-year data or otherwise indicate whether warrant denials had increased.

McCord and Adams deny that there was a clear increase in warrant denials for CCW motor vehicle arrests.  McCord testified that she never observed an increase.  Adams stated that he would have no basis for knowing whether warrant denials increased because he never evaluated all of his unit's cases and compared them to prior years.  Nevertheless, the parties agree that certain CCW motor vehicle arrests likely should not have been made.  All of the parties agree that there was at least one potentially problematic incident in April or May or 2021 where officers arrested five out of six passengers of a vehicle, despite the sixth passenger having an expired concealed pistol license and the other five passengers lacking clear access to the only recovered firearm.

### C.  Allegations of Retaliation

Ball points to four actions taken by the defendants that he believes amount to retaliation for his reports of unconstitutional weapons arrests.

### 1.  Detainee Releases

First, Ball says that sometime around May 20, 2021, Lieutenant McCord told him that he was no longer authorized "to just release a prisoner" if he found probable cause lacking for an

arrest but instead had "to go through her." Ball assumed that McCord took away his authority to release detainees because of the concerns he raised to the Special Operations Unit regarding improper stops and CCW arrests. He described reviewing arrests for probable cause and releasing detainees as one of his core job responsibilities.

McCord testified that she never took away Ball's authority to release detainees, but merely asked him — and all of her other reports — to let her know when individuals were released because probable cause did not exist for their arrest. McCord explained that she needed real-time updates on detainee releases because it was her job to know whether individuals were detained and warrants were issued in all of her cases. She therefore asked all of her officers and sergeants to send her a text message or email informing her when they released a detainee, and then to go ahead and make the release whether she responded or not. McCord testified that she never took away Ball's authority to release detainees where probable cause did not exist for their arrest, never ordered anyone to submit a warrant where probable cause was lacking, and never treated Ball differently from anyone else. However, she acknowledged that she instituted the new real-time notice system after she disagreed with one of Ball's probable cause determinations in April or May 2021. Previously, McCord would review detainee releases after the fact on a weekly or monthly basis, leaving her unable to intervene if she believed that probable cause in fact existed for an arrest.

Deputy Chief Wilson testified that McCord lacked the authority to limit Ball's ability to discharge detainees upon a finding that they were held without probable cause. However, he also said that there was an "expectation" in the PDU that lieutenants would know when prisoners were discharged, and thus McCord was required to engage in "consultation" with her sergeants when they release detainees.

### 2. Incipient Assignment Out

Second, Ball alleges that he was temporarily assigned out of the 10th Precinct PDU in retaliation for raising concerns regarding CCW motor vehicle arrests. That reassignment, however, never actually came to pass.

On the morning of May 27, 2021, Lieutenant McCord and Captain Severy sought leave to temporarily assign Ball out of the 10th Precinct PDU. McCord contacted Commander Stewart, who met with McCord and Severy regarding concerns that Ball was gossiping about private conversations of which he was not a part. Stewart directed Severy to call Captain Svec (or Speck — his name is spelled both ways in the deposition transcripts), who reported directly to Deputy Chief Wilson, had administrative oversight over the PDUs, and signed off on and arranged for assignments-out. Around 10:30 a.m., Svec contacted Wilson to inform him that he and 10th Precinct leadership were initiating an investigation into gossiping allegations and that he recommended that Ball be reassigned temporarily while the investigation proceeded. Svec recommended that Ball be assigned out to Data Quality Control because of vacancies in that division. Deputy Chief Wilson verbally "signed off" on Svec's recommendation.

A short time later, Captain Svec called Captain Severy to confirm that Ball would be assigned out to Data Quality Control. Severy and McCord then informed Ball that he was being reassigned. Severy directed Ball to finish his duties for the day, then go home and prepare to report to Data Quality in the morning. Ball then left the PDU and contacted his attorney.

Lieutenant McCord, Captain Severy, and Deputy Chief Wilson explained why Ball was investigated for gossiping. McCord testified that on May 26, 2021, she held a private, closed-door meeting with Detective Kuhar, who objected to PDU Officer Mikela Moore being placed on his detective team. Hours later, however, Moore called McCord and informed her that she was upset because she heard about McCord's meeting with Kuhar. McCord believed that the only way for

Moore to have heard about the private conversation was if someone had sat outside her office and listened to the meeting through her closed door.  She immediately suspected Ball, because he had a close relationship with Moore, and asked Moore if Ball was the person who told her about the conversation.  When Moore did not respond, McCord assumed that her suspicion was correct.  McCord brought her suspicions to Severy, who tested whether conversations were audible through McCord's office door, and who recommended that McCord call Commander Stewart the next morning.  Moore later admitted to Internal Affairs that Ball called her and told her that he had heard about McCord's conversation with Kuhar.

Ball testified that he had no idea why he was being assigned out because Severy and McCord never told him who made the gossiping allegation or what he allegedly was gossiping about.  He thought that Commander Stewart also did not know why he was being assigned out, that Severy and McCord had circumvented her chain of command, and that Stewart told him he was being assigned out because he "expressed concerns about this unlawful order."  Ball therefore believed that the gossiping complaint was fabricated to justify removing him from the PDU in retaliation for his raising concerns about unconstitutional stops and arrests.

At some point, Ball called Commander Jacqueline Pritchett to voice his "concerns."  Ball did not report to Pritchett, who was then assigned to the Detective Bureau's Organized Crime unit, but he said that he trusted her because he had worked with her previously.  It is not clear from his testimony precisely what he told Pritchett or when he called her, although he said that he contacted her before McCord and Severy tried to assign him out.

Around 2:00 p.m., Commander Pritchett called Deputy Chief Wilson regarding Ball's reassignment.  She informed Wilson that Ball did not understand why he was being assigned out.  Thus, around 2:30 p.m., Wilson called Commander Stewart to ask whether the 10th Precinct

actually had explained to Ball why he was being reassigned.  During that conversation, Wilson and Stewart agreed that there was not yet enough evidence to warrant reassigning Ball and that the assignment out should be rescinded.  Wilson directed Stewart to advise Ball that he would not be reassigned while the gossiping investigation took place.  Stewart told Severy about the rescission, and Severy in turn informed Lieutenant McCord.  Either Severy or McCord promptly told Ball that his assignment out was rescinded.

At 5:07 p.m., Ball texted Deputy Chief Wilson, asking to speak with him about "concerns that I have concerning PDU Operations regarding arrest and violation of citizens rights."  Wilson dep., ECF No. 32-10, PageID.1515; Texts, ECF No. 30-24, PageID.1238-39.  Ball expressed that he had "made many attempts at addressing these matters not no avail" and that he had suffered retaliation as a result.  *Ibid.*  Wilson took Ball's messages "very seriously" and immediately called Ball to discuss his concerns.  Ball initially focused on his reassignment, which he felt was unfair, and Wilson reiterated that the reassignment had been rescinded.  Ball then discussed with Wilson his belief that individuals were being arrested without probable cause for carrying firearms.  Wilson promptly contacted Internal Affairs and asked them to conduct an investigation, which they did.

Later in the evening of May 27, 2021, Ball appeared in a WDIV television news story alleging that Detroit Police Department officers were ordered to arrest every occupant of a vehicle if they find a firearm during a traffic stop.  Although Ball's face was obscured and his name was not mentioned, his voice was recognizable.  The story prompted immediate discussions at the 10th Precinct and within the Detective Bureau.  In response, the department sent out an administrative message the next day, to be read at five roll calls, reminding officers that, "When making an arrest regarding a firearm involving multiple individuals, members must have individualized probable

cause to arrest each individual."  Admin. Msg., ECF No. 32-15, PageID.1547; Severy dep., ECF No. 32-9, PageID.1496.  McCord, Severy, and Adams testified that they first learned about Ball's concerns regarding CCW motor vehicle arrests when they saw the WDIV broadcast.

After May 27, 2021, Ball reported to the 10th Precinct PDU as usual, where he remained until his retirement.  Although he never reported to Data Quality Control, he testified that he felt isolated for the rest of his tenure at PDU and found it increasingly difficult to do his job.  He also said that he stopped working overtime.  His supervisors dispute Ball's account, testifying that they agreed to tread lightly, treat Ball normally, and make sure that he was comfortable in the unit.

### 3.  DROP Program

Ball further testified that he believes that the City of Detroit delayed modifications to its retirement plan in order to retaliate against him for raising concerns about unconstitutional policing.

Members of the Detroit Police Department who are covered by the department's Collective Bargaining Agreement may elect to participate in the department's Deferred Retirement Option Plan (DROP).  DROP Guidelines, ECF No. 30-20, PageID.1201-04.  The plan permits certain individuals to continue working after they are eligible for retirement, while freezing their compensation and rank for purposes of computing their pension benefit.  The decision to participate in DROP is irrevocable, meaning that individuals who continue working after freezing their compensation and rank must retire within 10 years from the date that they elect to do so.  Any changes to the DROP program must be approved by the U.S. Bankruptcy Court for the Eastern District of Michigan.

Ball enrolled in the DROP program on June 17, 2011, with an election date of July 28, 2011.  Ball long knew that his election to the DROP program meant that he would have a mandatory retirement date of July 28, 2021.  However, by May 2021, he was also aware that the

City of Detroit was negotiating to modify the DROP program in order to extend certain employees'
retirement dates.  Ball spoke with Mark Young, who was involved in the negotiations on behalf of
the Detroit Police Lieutenants & Sergeants Association, about the likelihood that his own DROP
date would be extended.  According to Ball, Young told him that "the Bankruptcy Judge had the
petition" to modify the DROP program "on his desk" and "was going to sign it," and as a result,
Ball "was not going anywhere" and "was safe."  However, the bankruptcy court did not issue any
order modifying the DROP program until September 21, 2021 — two months after Ball's
mandatory retirement date.  The September 21 order modified the DROP program to permit the
Chief of Police to grant individual retirement date extensions for up to 15 years upon a showing
that a member's retirement would cause hardship to the department.

Ball believes that the department purposefully delayed the modification in order to retaliate
against him, stating "that it was purposefully set that after I retired then they reinstated the DROP
Program where you could request an extension."  Ball dep., ECF No. 32-2, PageID.1339.  Ball
therefore retired as scheduled on July 28, 2021.  The department declined to give him the
traditional "coffee and cake" retirement celebration on that date.

There is some suggestion in the record that Ball conducted the WDIV interview because
he was upset about having to retire.  The Internal Affairs Division determined that Ball received a
notification on May 27, 2021 — the day of the interview — that he would be involuntarily retired
due to the limitations of the DROP program.  It was common knowledge at that time that Ball's
DROP date was in July 2021 and that he would be forced to retire on that date.  Nevertheless,
McCord acknowledged that the DROP program "was still up in the air" in May 2021 and that Ball
was upset that he actually had to retire.

4.  CRTP Forms

Finally, Ball suggests that Lieutenant Adams retaliated against him by yelling at him and calling him a "CRTP sergeant" in front of other supervisors.

"CRTP" stands for "Complainant Refused to Prosecute."  The Detroit Police Department has a CRTP form that individuals may sign if, after filing a police report, they decide that they "no longer wish to pursue prosecution."  CRTP Form, ECF No. 30-26, PageID.1246.  Lieutenant Adams first criticized Ball's use of the form in November 2020, when Ball presented the form to a shooting victim after the victim refused to give a statement while in public view.  Adams raised his concerns with Commander Stewart, who declined to pursue the matter further.  Then, on April 2, 2021, Ball again presented a CRTP form to a shooting victim while he was in the hospital.  Adams believes that it is highly unethical to use the form in this way, because it encourages victims not to cooperate with law enforcement and leaves open the possibility that victims' attackers will retaliate against them.  He also felt that Ball should have communicated with him directly before using the form in Adams's investigations.  Adams again raised Ball's use of the CRTP form with Ball's supervisors, but he does not remember the outcome of his conversations.

Sometime in May 2021, Ball argued with Adams regarding Ball's use of the CRTP forms.  Ball expressed his belief that the form can be a useful investigatory tool for getting a victim to identify their attacker while also closing the case.  But Adams called Ball an obstructionist.

Ball testified that, when he brought his concerns regarding unconstitutional CCW motor vehicle arrests to Adams on May 24, 2021, Adams merely yelled at him and called him a "CRPT sergeant" who did not know what he was doing.  He said Adams told him that he did not "have any right to come in there and question him about what he does and what he doesn't do" and that "he basically told me I was inadequate as a sergeant, and he kept reiterating that all I wanted to do

is have people sign forms not to prosecute." Ball dep., ECF No. 32-2, PageID.1333-34. Ball considered Adams' comments to be retaliatory.

### D.  *Monell* Allegations

Ball also pleaded in his complaint that the City of Detroit had an illegal policy or custom of retaliating against and attempting to silence employees who spoke out as citizens on matters of public concern. Compl., ¶¶ 43-45, ECF No. 1, PageID.9. However, he testified that he is not aware of a written policy encouraging retaliation, and when asked if an unwritten order essentially created a policy of retaliation, he responded, "I don't have an answer for that." Ball dep., ECF No. 32-2, PageID.1334. Deputy Chief Wilson testified that he was not aware that any other officers had made similar allegations and that the department has zero-tolerance policy for retaliation.

### E.  The Lawsuit

The plaintiff filed his complaint on July 16, 2021. The complaint pleads three claims: (1) a First Amendment retaliation claim against Captain Ian Severy and Lieutenants Donna McCord and Jason Adams; (2) a *Monell* liability claim against the City of Detroit; and (3) a Michigan Whistleblowers' Protection Act claim against all four defendants. The defendants filed their motion for summary judgment attacking all counts of the complaint.

### II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A trial is required when "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The party bringing the motion first must explain why the record is so settled that no genuine issues of material fact exist by "identify[ing] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). To rebut that showing, "[t]he nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 628 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). The opposing party must base that rebuttal on specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Notably, however, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 251-52).

## A. Protected Speech

For his federal retaliation claim, Ball invokes 42 U.S.C. § 1983, under which he must establish that a person acting under color of state law deprived him of a right secured by the Constitution or laws of the United States. *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Brosseau v. Haugen*, 543 U.S. 194, 197-98 (2004)). No one questions that the defendants acted under color of law during the events alleged in the complaint. The constitutional right Ball relies on is his right to free speech, that is, his right to criticize the government.

If a citizen engages in speech protected by the First Amendment, the state cannot lawfully retaliate against him. Retaliation consists of "adverse action" that would "deter a person of

ordinary firmness from continuing" to speak out.  *Maben v. Thelen*, 887 F.3d 252, 262 (6th Cir. 2018) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)).   But when it comes to public employees, the Court (not the jury) must determine whether the speech can be viewed as coming from "a [private] citizen addressing matters of public concern," rather than as a "public employee[] who makes statements pursuant to [his] official duties."  *Mayhew v. Town of Smyrna*, 856 F.3d 456, 461-62 464 (6th Cir. 2017) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)).

It is well established that "the First Amendment protects a public employee's right, *in certain circumstances*, to speak as a citizen addressing matters of public concern."  *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) (emphasis added).  But decades ago, the Supreme Court declared that public employees' First Amendment rights are more restricted than those of regular citizens because "government offices could not function if every employment decision became a constitutional matter."  *Connick v. Myers*, 461 U.S. 138, 143 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).  To show that the speech was protected, a public employee must demonstrate three elements: the comments must address "matters of public concern"; the employee must speak as a private citizen, that is, not as an employee engaged in his official duties; and the employee's speech interests must outweigh that of his public employer "in promoting the efficiency of the public services it performs through its employees."  *Evans-Marshall v. Board of Education*, 624 F.3d 332, 337-38 (6th Cir. 2010) (quoting *Pickering*, 391 U.S. at 568).

The defendants argue that Ball's First Amendment retaliation claim must fail because Ball's allegedly-protected speech — his assertion that he spoke to Wayne County assistant prosecutors about a pattern of unlawful arrests — were part the "standard operating procedure" of building cases and establishing probable cause and that Ball was obligated to report any misconduct as part of his job duties.  Ball counters that his protected speech consists of more than

his calls to the prosecutor, and that it was outside of his job duties to question, challenge, critique, or confront his supervisors about policies he believed to be unlawful.  Neither party, however, addressed the third prong of the public-employee test: whether Ball's interests in making the statements outweighed the department's interests in efficient operation as an employer.  The Court will give the nod to the plaintiff on that element, since the defendants do not contest it.  *DeCrane v. Eckart*, 12 F.4th 586, 594 (6th Cir. 2021) (assuming a plaintiff satisfied all three inquiries where the defendant only offered arguments relevant to one of them).

Did Ball's complaints about the 10th Precinct's arrest policy amount to speech as a private citizen?  When distinguishing "an individual's speech as a public employee from the individual's speech as a private citizen," *id.* at 595, the Sixth Circuit has "recognized several non-exhaustive factors to consider, including: the speech's impetus; its setting; its audience; and its general subject matter," *Mayhew*, 856 F.3d at 464 (citing *Handy-Clay v. City of Memphis*, 695 F.3d 531, 540 (6th Cir. 2012)).  The "who, where, what, when, why, and how" of the statement all "inform the answer" to the "'critical question'" of "'whether the speech at issue is itself ordinarily within the scope of an employee's duties.'"  *Ibid*. (quoting *Lane v. Franks*, 573 U.S. 228, 240 (2014)).  An official job description weighs heavily on the determination, coupled with the "ad hoc or de facto duties," *id.* at 465 (quoting *Weisbarth v. Geauga Park District*, 499 F.3d 538, 544 (6th Cir. 2007)), that "the employee actually performs on a day-to-day basis," *DeCrane*, 12 F.4th at 596 (citing *Buddenberg v. Weisdack*, 939 F.3d 732, 740 (6th Cir. 2019)).

Ball contends that he communicated his concerns regarding CCW motor vehicle arrests to four groups: (1) to Detroit Police Department officials within his chain of command (Lieutenant McCord, Captain Severy, and Deputy Chief Marlon Wilson); (2) to department officials outside his direct chain of command (Lieutenant Adams and Commander Pritchett); (3) to Wayne County

assistant prosecutors; and (4) to reporters during the WDIV interview.  There is limited evidence in the record regarding all four contacts, beyond Ball's own testimony.  Nevertheless, it is plain that Ball made most of these communications in his capacity as a public employee.

### 1.  Statements to McCord, Severy, and Wilson

Both Ball and McCord testified that Ball never said anything to McCord about unlawful CCW arrests, and they dispute whether Ball ever said anything to Severy.  Any comments that Ball did make to Severy or Wilson, however, he made pursuant to his official duties as a police sergeant.

Ball, McCord, and Severy repeatedly testified that reviewing arrests and detentions for probable cause was one of Ball's core job responsibilities.  *See, e.g.*, Ball dep., ECF No. 32-2, PageID.1304-05, 1311, 1322-27; McCord dep., ECF No. 32-3, PageID.1356; Severy dep., ECF No. 32-9, PageID.1483.  Their testimony is buttressed by Ball's job description, which indicates that verifying arrest reports, reviewing probable cause determinations, and observing subordinates' work for misconduct are among the "general expectations" for supervisors.  DPD Manual, Supervision, § 101.10-4, ECF No. 30-16, PageID.981.  Reporting systematic unlawful arrests to his supervisors therefore was within Ball's "ordinary job responsibilities," even if Ball's job description does not explicitly require him report systemic illegal conduct to management.  *Mayhew*, 856 F.3d at 464-65.  "After all, his job was to oversee" probable cause determinations, *ibid.*, to "observe all laws, regulations, procedures, and lawful commands of all ranking members of this department," and to "report the misconduct of members to a supervisor," DPD Manual, Code of Conduct, § 102.3-5.1, ECF No. 30-14, PageID.952-53.  "[W]hen a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job."  *Mayhew*, 856 F.3d at 465 (finding that it was

within the job responsibilities of a wastewater treatment supervisor charged with overseeing water-sample testing to report another supervisor for questionable sample reporting (quoting *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 350 (6th Cir. 2010))); *see also Housey v. Macomb Cnty.*, 534 F. App'x 316, 322 (6th Cir. 2013) (finding that it was within an employee's job duties to report misconduct when his responsibilities included ensuring compliance and reporting "trouble spots and recommending corrective actions"); *Haynes v. City of Circleville*, 474 F.3d 357, 364 (6th Cir. 2007) (finding that a police officer tasked with training police dogs was "carrying out his professional responsibilities" when he complained about the effects of reduced training without any obligation to do so).

Ball's rebuttal is not convincing. Citing *Barrow v. City of Hillview, Kentucky*, 775 F. App'x 801 (6th Cir. 2019), he maintains that reporting an unlawful, unwritten order to his supervisors was not within the scope of his job duties because he had never done so before and because he was bound by his job description to obey orders issued by higher-ranking members. DPD Manual, Supervision, § 101.10-4, ECF No. 30-16, PageID.981. *Barrow*, however, does not help him. In that case, the court of appeals determined that a local police officer's report of an investigative coverup by his fellow officers to the county sheriff and the FBI amounted to protected speech. The court found that reporting corruption related to the plaintiff's official duties as a police officer. But the speech was protected because the plaintiff's "ordinary job responsibilities did not include reporting allegations of public corruption to outside authorities" like the FBI. *Barrow*, 775 F. App'x at 813. In fact, Barrow, a patrolman, had even cooperated with the federal investigation by secretly recording conversations with the targeted police officers at the FBI's direction. *Ibid.*

In contrast, Ball's "crabbed reading of his admitted job duties does not comport" with the Supreme Court's "instruction" that the Court look at an employee's "ordinary job duties . . .

*practically*." *Mayhew*, 856 F.3d at 465 (citing *Lane*, 573 U.S. at 238; *Garcetti*, 547 U.S. at 424-25). "[A]d hoc or de facto duties can fall within the scope of an employee's official responsibilities despite not appearing in any written job description." *Ibid.* (quoting *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 544 (6th Cir. 2007). Moreover, Ball does not dispute that the department's manual also requires him "to report the misconduct of members to a supervisor," report any misconduct, or that it only binds him to observe the "*lawful* orders" of ranking members. DPD Manual, Code of Conduct, § 102.3-5.1, ECF No. 30-14, PageID.952-53 (emphasis added). Ball contends that an unlawful order was issued, and therefore he reported it in ordinary course, by his account, to McCord, and Severy, his superiors within the chain of command.

## 2.  Statements to Adams

The complaints Ball allegedly made to Adams similarly fall within the scope of Ball's job duties. Both Ball and Adams testified that they worked closely together. Ball further testified that he saw Adams as his "ranking supervisor," and that he brought his concerns about CCW arrests to Adams because Adams "was the boss." Ball's own testimony thus suggests that it was standard operating procedure for Ball to bring complaints to Adams. By doing so, Ball appears merely to have been "escalating reports up the organizational chart" — albeit not the chart as formally defined. *Mayhew*, 856 F.3d at 465. Moreover, "the determinative factor" is "not where the person to whom the employee communicated fit within the employer's chain of command, but rather whether the employee communicated pursuant to his or her official duties." *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 545 (6th Cir. 2007) (citing *Garcetti*, 547 U.S. at 424). The record establishes that Ball went to Adams pursuant to his official job duty of monitoring arrests.

### 3.  Statements to Prosecutors

The parties dispute whether it was within Ball's job duties to contact prosecutors regarding improper CCW arrests.  Notably, their testimony does not align with their arguments on summary judgment.  Although Ball testified that he for decades routinely called prosecutors to discuss "borderline" probable cause determinations, Ball dep., ECF No. 32-2, PageID.1315, he now argues that any calls he made to prosecutors were made in his capacity as a private citizen, because prosecutors were outside his chain of command, Resp., ECF No. 32, PageID.1279-80.  Conversely, Lieutenant McCord testified that it was "absolutely" inappropriate for Ball or any other officer to discuss probable cause determinations with prosecutors, McCord dep., ECF No. 32-3, PageID.1366, while arguing on summary judgment that it was "standard operating procedure" for Ball to reach out to prosecutors regarding probable cause, MSJ, ECF No. 30, PageID.299.

There is no dispute, however, that Ball regularly reached out to Wayne County assistant prosecutors to discuss probable cause — whether or not it was "protocol" for him to do so.  "Speech by a public employee made pursuant to *ad hoc* or *de facto* duties not appearing in any written job description is nevertheless not protected if it 'owes its existence to [the speaker's] professional responsibilities.'"  *Fox*, 605 F.3d at 348 (citing *Weisbarth*, 499 F.3d at 544); *see also Garcetti*, 547 U.S. at 421.  Ball testified that he "had been contacting Lori Mireless and Kim Miles all the time" and, in the course of those communications, said something to them "in regard to your arrests and the lack of probable cause" that he "can't remember verbatim."  Ball dep., ECF No. 32-2, PageID.1328.  Ball's testimony indicates that his statements to Mireless and Miles owed their "existence" to his *ad hoc* job duties, which "always" included contacting prosecutors "every day" while working on his cases.  *Id.* at PageID.1316.  That distinguishes Ball's case from *Barrow*

and *See v. City of Elyria*, 502 F.3d 484, 493 (6th Cir. 2007), where a police officer took the unusual step of contacting the FBI to report illegal activity within his police department.

Ball's testimony establishes that his outreach to prosecutors was anything but unusual; rather, it occurred pursuant to his official job duty of monitoring arrests.

### 4. Statements to Pritchett and WDIV

That leaves the complaints Ball allegedly made to Commander Pritchett and the comments he made during his WDIV interview. The latter comments clearly were made in Ball's capacity as a private citizen: Ball conducted the WDIV interview without any "official imprimatur" in a manner that plainly was intended for the general public. *See DeCrane*, 12 F.4th at 597-98. The call to Pritchett is a closer call. Pritchett was well outside of Ball's chain of command, and there is no evidence that Ball regularly reached out to her in the course of his ordinary job duties. On the other hand, the timeline of events suggests that Ball called Pritchett to complain not about the alleged illegal arrest policy, but about being reported out, which is the kind of speech that "owes its existence" to Ball's job responsibilities. *Fox*, 605 F.3d at 348. The Court need not resolve that question, however, because Ball's evidence of adverse action and causation is wanting.

### B. Adverse Action

To prove unlawful retaliation, a plaintiff must show that a state actor took "action" against him that "would chill or silence a person of ordinary firmness from future First Amendment activities." *Benison v. Ross*, 765 F.3d 649, 659 (6th Cir. 2014) (citing *Ctr. For Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 822 (6th Cir. 2007)); *see also Thaddeus-X*, 175 F.3d at 397. The Court must "tailor" its analysis "to the circumstances of this specific retaliation claim." *Mezibov v. Allen*, 411 F.3d 712, 721 (6th Cir. 2005) (citing *Thaddeus-X*, 175 F.3d at 398). In the context of this case then, the question is whether the alleged retaliation would deter a police

sergeant of ordinary firmness from exercising his First Amendment rights.  *See ibid.* (citing *Mattox v. City of Forest Park*, 183 F.3d 515, 522 (6th Cir. 1999)).  This ordinarily is a question of fact for the jury.  *Maben v. Thelen*, 887 F.3d 252, 266 (6th Cir. 2018) (quoting *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002)).  However, some "truly inconsequential" adverse actions are so *de minimis* and inconsequential that they do not rise to the level of a constitutionally-cognizable injury.  *Ibid.* (citing *Thaddeus-X*, 175 F.3d at 398).

Ball contends that he suffered five adverse actions: (1) a substantial change in his job responsibilities; (2) reassignment to Data Quality Control; (3) a delayed modification to the DROP program; (4) disparaging remarks regarding his use of the CRTP form; and (5) denial of recognition upon his retirement.  None of these harms are sufficiently adverse to be cognizable in a section 1983 retaliation claim.

### 1.  Changes to Job Duties

Certainly, any limitations that Lieutenant McCord placed on Ball's ability to release detainees caused Ball more than *de minimis* harm.  The parties dispute the extent to which McCord limited Ball's release authority: Ball said that McCord had to grant him permission to discharge any detainees, while McCord testified that she merely asked Ball to alert her when he was discharging detainees without waiting for her sign-off.  Deputy Chief Wilson agreed with McCord, testifying that consulting with Ball on releases simply was part of McCord's job.

The Sixth Circuit has held that reductions in job responsibilities may constitute adverse actions, typically in cases where plaintiffs have suffered formal or *de facto* demotions.  *See Boxill v. O'Grady*, 935 F.3d 510, 518 (6th Cir. 2019) (formal demotion); *Dye v. Off. of the Racing Comm'n*, 702 F.3d 286, 303 (6th Cir. 2012) (formal demotion and decrease in workdays and pay); *Farmer v. Cleveland Pub. Power*, 295 F.3d 593, 602 (6th Cir. 2002) (plaintiff reduced from a

"supervisor-level employee engaged in management" to "an employee who engages merely in clerical and training tasks"), *abrogated on other grounds by White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232 (6th Cir. 2005).  That is because "[t]he term 'adverse action' has traditionally referred to 'actions such as discharge, demotions, refusal to [h]ire, nonrenewal of contracts, and failure to promote.'"  *Handy-Clay v. City of Memphis*, 695 F.3d 531, 545 (6th Cir. 2012) (quoting *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 724 (6th Cir. 2010)).  Nevertheless, the court of appeals has also allowed that a plaintiff "need not have suffered loss of salary, promotional opportunities, seniority or other monetary deprivations to have a cognizable interest protected by the First Amendment."  *Boger v. Wayne Cnty.*, 950 F.2d 316, 321 (6th Cir. 1991).  Therefore, "any action that would deter a person of ordinary firmness from exercising protected conduct will suffice" to constitute an adverse action, "which may include harassment or publicizing facts damaging to a person's reputation."  *Fritz*, 592 F.3d at 724; *see also Boger*, 950 F.2d at 321 (noting that "impairment of reputation . . . personal humiliation, and mental anguish and suffering" may be compensable under section 1983).

Consulting with his ranking officer regarding detainee releases is a far cry from suffering "personal humiliation" or "mental anguish" — especially knowing that it also was McCord's job responsibility to review probable cause and stay abreast of detainees.  It stands to reason that supervisors must be able to make small adjustments to job duties without exposing themselves to liability in a retaliation claim.  And even viewing the evidence in the light most favorable to Ball, there is nothing to suggest that limiting his authority unilaterally to release detainees amounted to a demotion.  All the parties agree that Ball remained in his role and continued to do his job until his retirement.

Ball has not demonstrated that any modest changes made to his job duties rose to the level of constitutionally cognizable harm.

### 2. Assignment Out

The internal discussions about Ball's proposed reassignment to Data Quality Control also do not constitute adverse action, because the assignment out was rescinded before any injury to Ball could occur.  Involuntary transfers may qualify as adverse actions, even "whether neither grade nor salary is affected," because transfers may cause employees reputational harm or "negatively impact their daily experiences including their commute, coworker friendships, and community relationships."  *Leary v. Daeschner*, 349 F.3d 888, 901 (6th Cir. 2003) (citing *Boger v. Wayne Cnty.*, 950 F.2d 316, 321 (6th Cir. 1991)).  But that reasoning does not apply here because there is no evidence that Ball suffered "*extreme* embarrassment, humiliation, *extreme* mental anguish, and loss of professional esteem" due to a transfer that never actually took place.  *Boger*, 950 F.2d at 321 (emphasis added).  Ball does not even allege that he suffered any of the relevant harms.  At most, he alleges that "the office became divided," that it "seemed like he was the odd man out," and that he "felt like [he] was ostracized" after May 27, 2021.  Ball dep., ECF No. 32-2, PageID.1333.  But "merely claiming a generalized harm to . . . character and reputation" without alleging concrete personal injuries "do[es] not meet the constitutional threshold for First Amendment retaliation."  *Mezibov v. Allen*, 411 F.3d 712, 722 (6th Cir. 2005).

Ball cannot demonstrate that he suffered a "legally actionable personnel decision" when he remained in the PDU, without any changes to pay or benefits, until his planned retirement.  *See Kreuzer v. Brown*, 128 F.3d 359, 363 (6th Cir. 1997).

### 3.  DROP Program

The official actions relating to the retirement regulations do not amount to adverse action in the context of this case.  Ball's retirement date was established 10 years earlier for business reasons related to the Detroit Police Department's pension program.  Although forced early retirement may be cognizable as an adverse action, *see Meyers v. City of Cincinnati*, 934 F.2d 726, 728-30 (6th Cir. 1991), "[t]he First Amendment is not a tenure provision," *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 76 (1990).  It "does not create an entitlement to life-time employment."  *Kreuzer v. Brown*, 128 F.3d 359, 364 (6th Cir. 1997).  The only way Ball's retirement date could have been changed is if the federal bankruptcy court (which oversaw the City's bankruptcy proceeding) modified the DROP program.  Ball says that *the department* somehow delayed modifying the program to retaliate against him; however, he has presented no evidence to substantiate that claim.  Nothing in the record suggests that the City of Detroit intentionally delayed any modifications or took any actions motivated by animus toward Ball.  Nor has he shown that that decision to change the rules belonged to anyone but the bankruptcy court, or that the City was somehow in league with the court on that modification.  Thus, Ball has failed to demonstrate that there is a genuine issue for trial regarding action on his retirement date.

### 4.  CRTP Comments

Any harm Ball suffered as a result of the remarks Lieutenant Adams made criticizing Ball's use of CRTP forms is "too minimal to be constitutionally cognizable."  *See Mezibov v. Allen*, 411 F.3d 712, 722 (6th Cir. 2005).  Ball does not allege that Adams' statements caused him any specific injury; at most, his testimony suggests that he was embarrassed by Adams "basically" telling him that he "was inadequate as a sergeant."  Ball dep., ECF No. 32-2, PageID.1334.  Again, although the court of appeals has recognized "in some cases" that "'injury based on embarrassment,

humiliation and emotional distress' is sufficient to be actionable under § 1983," it has done so only in rare instances where defendants reveal false, irrelevant, or "extremely intimate and humiliating details" about a plaintiff. *See Mattox*, 183 F.3d at 521-23 (6th Cir. 1999) (quoting *Bloch v. Ribar*, 156 F.3d 673, 679-80 (6th Cir. 1998); *see also Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 585 (6th Cir. 2012) (distinguishing the non-adverse disclosure of a "traumatic childhood incident" in *Maddox* to the adverse disclosure of intimate details about a victim's rape in *Bloch*). Ball's and Adam's dispute about the efficacy of CRTP forms does "not rise to the same 'level'" as the humiliating disclosures found cognizable by the court of appeals. *See Wurzelbacher*, 675 F.3d at 585. Nor is it equivalent to being fired or demoted. *See Mezibov*, 411 F.3d at 722. Any unspecified embarrassment that Ball suffered as a result of that comment therefore is "insufficiently adverse to establish First Amendment retaliation" in this case. *See Wurzelbacher*, 675 F.3d at 585.

### 5. Retirement Party

The plaintiff also contends that Lieutenant McCord deprived him of the traditional "coffee-and-cake" celebration upon his retirement because of the comments Ball made to the television reporter. Ball does not specifically say that this snub itself amounted to illegal adverse action. Rather, he argues that the failure to recognize his 35 years of service is "evidence or retaliatory animus." But that alone or in combination with the plaintiff's other allegations does not even rise to the level of "a generalized harm to . . . character and reputation," and it certainly "do[es] not meet the constitutional threshold for First Amendment retaliation." *Mezibov*, 411 F.3d at 722.

### C. Causation

Even if Ball were able to show that his grievances constituted adverse action, he comes up short on evidence connecting those acts with any protected conduct. To establish causation, Ball must "point to specific, nonconclusory allegations reasonably linking [his] speech to employer

- 27 -

discipline." *Farmer*, 295 F.3d at 602 (6th Cir. 2002) (quoting *Bailey v. Floyd Cnty. Bd. of Educ. By & Through Towler*, 106 F.3d 135, 144 (6th Cir. 1997)). "A First Amendment retaliation claim under § 1983 ultimately requires a 'but-for' causal connection — meaning that the public employer would not have taken the harmful action 'but for' the protected speech." *DeCrane*, 12 F.4th at 602 (citing *Nieves v. Bartlett*, — U.S. —, 139 S. Ct. 1715, 1722 (2019)).

The first problem for Ball is the timeline of events. He made two potentially protected communications: a call to Commander Pritchard that most likely occurred sometime on May 27, 2021, and a television interview later that evening. But it appears that he suffered four of the allegedly adverse actions *before* he made either communication. Ball alleges that Lieutenant McCord altered his authority to release detainees unilaterally around May 20, 2021. Lieutenant Adams called Ball a "CRPT sergeant" on May 24, 2021. Lieutenant McCord and Captain Severy informed Ball late on the morning of May 27, 2021 that he was being assigned out of the PDU. Ball also received notice sometime that morning that his DROP date would not be extended. The record contains no evidence, or even a suggestion, that the timing of the bankruptcy court order modifying the DROP program had anything to do with Ball. And although the deprivation of a retirement gathering occurred after the television interview, it is not actionable as an adverse event.

The only meaningful ambiguity in this timeline is the precise timing of Ball's call to Commander Pritchett. Deputy Chief Wilson testified that Pritchett reached out to him around 2:00 p.m. on May 27, 2021, shortly after she received the call from Ball, to discuss Ball's assignment-out. Although Ball never testified as to the specific time or date of his conversation with Pritchett, he stated that he called Pritchett before he left the building on May 27th and before McCord and Severy attempted to assign him out. Logically, that is impossible: if Ball only called Pritchett before any efforts were made to assign him out, how would Pritchett have raised the assignment-

out with Wilson and led him to reconsider Ball's reassignment? But even assuming that Ball's version of events is true, the evidence does not establish that Ball's call to Pritchett was the but-for cause of any adverse action. There is nothing in the record to suggest that Captain Severy, Lieutenant McCord, or Lieutenant Adams knew that Ball had called Pritchett. *Cf. Handy-Clay*, 695 F.3d at 545-56 ("[T]here is enough evidence in the record to support the proposition that the defendants knew of [the plaintiff's] protected speech."). Nor does the "chronology of events support[] an inference of causation." *Ibid.*

Although it is possible that, "on a particular set of facts, extremely close temporal proximity could permit an inference of retaliatory motive, . . . often evidence in addition to temporal proximity is required to permit the inference." *Holzemer v. City of Memphis,* 621 F.3d 512, 526 (6th Cir. 2010) (quoting *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010)). Here, there is neither evidence of "extreme" temporal proximity — viewing the evidence in the light most favorable to Ball, it is entirely unclear when Ball called Pritchett — nor any other evidence, chronological or otherwise, to support the inference that the call was a "substantial or motivating factor" in any of the allegedly-adverse actions Ball suffered. *Ibid.* (quoting *Smith v. Campbell*, 250 F.3d 1032, 1038 (6th Cir. 2001)). To the contrary, there is substantial evidence that the call *helped* Ball, because it caused Wilson to further investigate the gossiping allegations and ultimately to rescind Ball's reassignment.

Ball cannot rely on the chronology of events to survive summary judgment, and there is nothing else in the record from which causation could be inferred. Ball has not presented evidence that similarly situated individuals were treated differently, *Thaddeus-X*, 175 F.3d at 399, or demonstrated that "little other than the protected activity could motivate the retaliation" he allegedly suffered, *Vereecke*, 609 F.3d at 401 (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d

516, 524–25 (6th Cir. 2008)).  And he has failed to explain how the "totality of the circumstances" support "the inference of a retaliatory motive," since there is "an obviously nonretaliatory basis for the defendants' decision[s]" — most notably, that the gossiping investigation motivated the potential assignment-out, and that Lieutenant McCord's need to stay abreast of detainee releases motivated her to adjust the discharge process.  *Id.* at 401.  Ball therefore has failed to raise any genuine issues of fact sufficient to create a jury question on the essential element of causation.

The defendants are entitled to summary judgment on Ball's First Amendment retaliation claim.  Because the Court did not find a constitutional violation, it need not reach the defendants' qualified immunity argument, which was raised only cursorily in their brief and in Ball's response. *Holzemer*, 621 F.3d at 527.

### D.  *Monell* Claim

Local governmental entities like the City of Detroit cannot be held liable under 42 U.S.C. § 1983 solely for the acts of their agents; they are accountable under that statute only for their own conduct.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) (holding that "a municipality cannot be held liable [under section 1983] solely because it employs a tortfeasor — or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory").  The plaintiff, therefore, must point to an official policy, custom, or practice of that local government as the source of the constitutional violation.  *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005).  And he must allege facts that show a causal connection between the policy and the injury.  *Board of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997); *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012).

Ball has made no effort to do so in response to the defendants' summary judgment motion.  Although   the   Court   must   "intelligently   and   carefully   review   the   legitimacy   of

. . . an unresponded-to motion," it need not "excavate all of the presented record, and find for itself any nuggets of evidence that might demonstrate genuine issues of material fact." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 405-06 (6th Cir. 1992); *see also* Fed. R. Civ. P. 56(e) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."). "The failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion." *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009) (citing *Skousen v. Brighton High School*, 305 F.3d 520, 527 (6th Cir. 2002)); *see Brown v. VHS of Michigan, Inc*., 545 F. App'x 368, 372 (6th Cir. 2013) (collecting cases holding that "a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").

The City is entitled to summary judgment on Ball's claim against it.

### E.   Whistleblower Protection Act Claim

Ball also brought a state law claim under Michigan's Whistleblowers' Protection Act (WPA), Mich. Comp. Laws § 15.362.  To survive summary judgment, Ball must offer some evidence on each of the following elements: that (1) he "was engaged in protected activity as defined by the act, (2) the defendant took an adverse employment action against the plaintiff, and (3) a causal connection exists between the protected activity and the adverse employment action." *Debano-Griffin v. Lake County*, 493 Mich. 167, 175, 828 N.W.2d 634, 638 (2013).

The defendants concede the first element — whether Ball was engaged in a protected activity — for the purposes of summary judgment.  To establish the second, Ball must demonstrate that he "was discharged, threatened, or otherwise discriminated against regarding his or her compensation, terms, conditions, location, or privileges of employment." *Wurtz v. Beecher Metro*

*Dist.*, 495 Mich. 242, 251, 848 N.W.2d 121, 126 (2014).  Ball's only relevant allegations are that he "stopped working overtime" of his own accord, and that the City of Detroit delayed modifying the DROP program in order to force him to retire on his scheduled date.  Ball dep., ECF No. 32-2, PageID.1339.  But, as described above, Ball cannot demonstrate that "[a] causal connection exists" between his alleged protected activity and the timing of the modification to the DROP program.  *Debano-Griffin*, 493 Mich. at 175, 828 N.W.2d at 638.  The program may be modified only by federal court order, a process that has nothing to do with Ball.

The record is similarly bereft of "significant probative evidence" that Ball was denied overtime pay, let alone because he engaged in protected conduct.  *See Anderson*, 477 U.S. at 256. Although Ball briefly stated that he "stopped working overtime" after May 27, 2021, he immediately clarified that his claim for "lost wages and . . . other damages" was "due to the fact that I believe that it was purposely set that after I retired, then they reinstated the DROP Program." Ball dep., ECF No. 32-2, PageID.1339.  "I don't think," Ball testified, "that I actually lost any wages due to retaliation."  *Ibid.*  There is no other evidence regarding overtime pay in the record.

Because Ball cannot make a *prima facie* WPA case, the defendants are entitled to summary judgment on count three of Ball's complaint.


## III.  Conclusion

The plaintiff has not offered sufficient evidence to establish a material fact question on all the elements of his federal or state law claims.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment (ECF No. 31) is **GRANTED**.

It is further **ORDERED** that the complaint is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   December 29, 2022